# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| UNIQUE LITTLE, individually and on behalf of all others similarly situated, | Case No. 1:25-cv-176 |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| GRAVY ANALYTICS, INC., VENNTEL, INC., and UNACAST INC., | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff Unique Little ("Plaintiff"), bring this Class Action Complaint ("Complaint") against Gravy Analytics, Inc. ("Gravy Analytics"), Venntel, Inc. ("Venntel"), and Unacast Inc. ("Uncast" and, collectively with Gravy and Venntel, "Defendants") individually and on behalf of all others similarly situated (the "Class"). Plaintiff alleges, upon personal knowledge as to her own actions and experiences and her counsels' investigation, and upon information and belief as to all other matters, as follows:

### SUMMARY OF ACTION

1.      In December 2019, the New York Times published "The Privacy Project": a series of opinion articles that revealed the staggering extent that mobile phones enabled companies to track the precise locations of Americans at every granular moment in their days:  "Every minute of every day, everywhere on the planet, dozens of companies — largely unregulated, little

scrutinized — are logging the movements of tens of millions of people with mobile phones and storing the information in gigantic data files."[1]

2.    The location signals or "pings" captured by these companies represent the precise locations of a single smartphone over the course of weeks, months, and years. "If you could see the full trove [of location data collected]," the New York Times warned, "you might never use your phone the same way again."[2]

3.    Defendants Gravy Analytics, Unacast, and Venntel have been some of the largest and most important companies in the location data industry for years, collating smartphone location data from around the world, in some instances, to sell to the U.S. government.

4.    The companies, including Defendants, that are amassing this trove of tracking data have long justified their business based on three claims: (1) people consent to be tracked, (2) the data is anonymous, and (3) the data is secure.

5.    However, recent events have revealed the stunning falsity of all three claims.

6.    First, recent action by the Federal Trade Commission ("FTC") has debunked the claim that Americans have consented to be tracked by location data brokers like Defendants.

7.    On December 3, 2024 the FTC took action against Defendants Gravy Analytics and Venntel by filing a complaint against the companies for unfairly selling sensitive consumer location data, and by collecting and using consumers' location data without obtaining verifiable user consent for commercial and government uses. The FTC action culminated in a unanimous, finalized order on January 15, 2025, prohibiting Gravy Analytics and its subsidiary Venntel from

---

[1] Stuart A. Thompson and Charlie Warzel, *Twelve Million Phones, One Dataset, Zero Privacy*, NEW YORK TIMES (Dec. 19, 2019),
https://www.nytimes.com/interactive/2019/12/19/opinion/location-tracking-cell-phone.html.
[2] *Id.*

selling, disclosing, or using sensitive location data except in limited circumstances involving national security or law enforcement.

8.    Second, describing location data as "anonymous" has long been understood to be a false claim, debunked in multiple studies. As Professor Paul Ohm, a law professor and privacy researcher at the Georgetown University Law Center, summarized in 2019: "Really precise, longitudinal geolocation information is absolutely impossible to anonymize. . . D.N.A. is probably the only thing that's harder to anonymize than precise geolocation information." The FTC Complaint against Defendants further confirmed that "[Defendants'] precise geolocation data is not anonymous."

9.    Finally, a recent data breach of Defendants' systems has crystallized the falsity of the third and final claim: the trove of location data collected by Defendants is *not* secure.

10.    On January 4, 2025, hackers announced a successful breach of Defendants' systems and networks. The hackers claim to have stolen a "mountain" of data, including customer lists, information on the broader location data tracking industry, and, perhaps most concerningly, location data harvested from individuals' smartphones which show peoples' precise movements (the "Data Breach").[3] Reportedly Defendants' inadequate and deficient security enabled the hackers to gain deep access to the company's infrastructure, including Amazon S3 buckets and server root access. The hackers claimed to have had access to these systems for years, dating back to as early as 2018.

11.    In a message posted to two different Gravy Analytics websites, the hackers wrote that "*Personal data of millions of users is* affected" and noted that the Defendants would have 24

---

[3] Joseph Cox, *Hackers Claim Massive Breach of Location Data Giant, Threaten to Leak Data*, 404MEDIA (Jan. 7, 2025), https://www.404media.co/hackers-claim-massive-breach-of-location-data-giant-threaten-to-leak-data/.

1021114.1

hours to answer and provide an undisclosed ransom before the hackers would start to leak the data to the public.[4]

12.    A small sample of the data posted by the hackers revealed that the hackers successfully obtained from Defendants the apparent historical location of smartphones, including the precise longitude and latitude coordinates of the phone and the time at which the phone was there. And, recent reporting on the Data Breach has confirmed that the hacked Gravy Analytics data included *tens of millions of mobile phone coordinates of devices inside the U.S.*, Russia, and Europe, obtained through individuals' use of major mobile applications such as Tinder, Grindr, Candy Crush, Subway Surfers, Moovit, My Period Calendar & Tracker, MyFitnessPal, Tumblr, Microsoft's 365 office application, Yahoo's email client, religious-focused apps such as Muslim prayer and Christian Bible apps, various pregnancy trackers, and many VPN apps, which users generally download, ironically, in an attempt to protect their privacy.[5]

13.    This highly personal location data from users can be used to precisely identify individuals and where they have been, including sensitive information about consumers' visits to health-related locations (like out-of-state abortion clinics), government buildings, and places of worship.

14.    Another leaked file called "users" included multiple well-known companies, such as Apple, Uber, LexisNexis, Equifax, Comcast, Gannett, and many more, demonstrating the breadth and value of the data Defendants collected to some of the biggest companies in the United States.

---

[4] *Id.* (emphasis added).

[5] Joseph Cox, *Candy Crush, Tinder, MyFitnessPal: See the Thousands of Apps Hijacked to Spy on Your Location*, WIRED (Jan. 9, 2025), https://www.wired.com/story/gravy-location-data-app-leak-rtb/

15.    Plaintiff Little has been injured as a direct and proximate result of Defendants' failure to adequately secure her and millions of other consumers' sensitive location data, culminating in the Data Breach. Plaintiff and the Class also face an imminent and substantial risk of further injuries.

16.    As a result of the Data Breach, Plaintiff and Class Members suffered concrete injuries in fact including, but not limited to: (i) invasion of privacy; (ii) theft of their location data; (iii) lost or diminished value of their location data; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) nominal damages; and (vii) the continued and certainly increased risk to their location data, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect their sensitive location data.

17.    Defendants maintained, used, or shared Plaintiff's and Class Members' personal data in a negligent and/or reckless manner. In particular, their data was used, stored, and transmitted by Defendants in a condition such that it was highly vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's and Class Members' location data was a known risk to Defendants, and thus, Defendants were on notice that failing to take steps necessary to secure their sensitive location data from those risks left that property in a dangerous condition.

18.    Defendants disregarded the rights of Plaintiff and Class Members by, among other things, intentionally, willfully, recklessly, or negligently failing to implement adequate and

1021114.1

reasonable measures to protect its data systems against unauthorized intrusions; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff and Class Members prompt and accurate notice of the Data Breach.

19.    Plaintiff brings this class action lawsuit on behalf of all those similarly situated to address Defendants' inadequate safeguarding of her and Class Members' sensitive location data that they collected and maintained, and for failing to provide timely and adequate notice to Plaintiff and other Class Members that their information had been subject to the unauthorized access by an unknown third party and precisely what specific type of information was accessed.

20.    Through this Complaint, Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose sensitive location data was accessed and stolen during the Data Breach.

21.    Plaintiff and Class Members have a continuing interest in ensuring that their sensitive location data is properly safeguarded, and they should be entitled to injunctive and other equitable relief.

22.    Plaintiff and the Class now bring claims against Defendants for negligence and negligence *per se*, breach of implied contract, unjust enrichment, and state statutory claims seeking damages, declaratory relief, and injunctive relief.

**JURISDICTION AND VENUE**

23.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). There are at least 100 putative Class Members, the aggregated claims of the individual Class Members exceed the sum or value of $5,000,000 exclusive of interest and costs, and members of the proposed Class, including Plaintiff, are citizens of states different from Defendants.

1021114.1

24.     This Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367 pursuant to 28 U.S.C. § 1391.

25.     The Court has personal jurisdiction over Defendants because, personally or through their agents, Defendants operate, conduct, engage in, or carry on a business or business venture in this state. Defendants each intentionally avail themselves of the markets within this District such that they could each reasonably foresee litigation being brought in this District, to render the exercise of jurisdiction by this Court just and proper

26.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action occurred in, was directed to, and/or emanated from this District.

## **PARTIES**

27.     Plaintiff Unique Little is a citizen of the state of California. Plaintiff Little has a smart phone which she carries with her at all times, and which she uses (or has used) to access and utilize a number of mobile applications, including the Microsoft Outlook App, Tinder, Candy Crush, and MyFitnessPal. Upon information and belief, Ms. Little's information has been collected by Defendants as a result of her use of this and other mobile applications and was subsequently affected by this Data Breach.

28.     Defendant Gravy Analytics is a Delaware corporation with its principal place of business located at 44679 Endicott Drive Suite 300, Ashburn, Virginia 20147. Defendant Gravy Analytics processes data from a billion mobile devices daily.

29.     Defendant Venntel is a Delaware corporation with its principal place of business located at 2201 Cooperative Way, Suite 600, Herndon, Virginia 20171. Venntel is a wholly-owned subsidiary of Gravy Analytics.

1021114.1

30.    Defendant Unacast is a Delaware corporation with its principal office or place of business located at 44679 Endicott Drive Suite 300, Ashburn, Virginia 20147. Gravy Analytics merged with Unacast in November 2023.

## FACTUAL ALLEGATIONS

### *Background*

31.    Mobile phones are ubiquitous in the daily lives of Americans. Most consumers report keeping their phones near them at all times, meaning that their phones go everywhere that they go. These devices can constantly track a user's location, generating records of a user's whereabouts throughout the day. Mobile phones are a source of personal information about their users, including personal information in the form of this location data.

32.    Location data can expose sensitive information such as medical conditions, sexual orientation, political activities, and religious beliefs. When collected across time, this data can reveal every aspect of a consumer's life. Indeed, Defendants make this point in marketing material to potential customers, asserting that "Where we go is who we are." This is more than just an advertising slogan for Defendants – it is the very point of their business.

33.    Defendants amass and sell raw location data that tracks consumers' movements so that their customers can glean insights into consumers' private lives. In addition, Defendant Gravy Analytics also uses this data to identify consumers based on attributes and behaviors the data reveals, including sensitive and personal attributes and behaviors, and it then discloses this information to third parties.

34.    Defendants do not collect this location data directly from consumers, but rather obtain the consumer location data from other data suppliers, through which Defendants claim to

"collect, process and curate" over *17 billion* signals from approximately a billion mobile devices *on a daily basis*.

35.     These location signals, gathered from consumers' mobile phones, identify consumers' precise geolocation by latitude and longitude coordinates at the time the signal was gathered. Each location signal is also associated with a unique mobile device identifier and is assigned to a consumer's mobile phone to assist marketers in advertising to consumers. These data signals are collected from a mobile device's GPS coordinates and may, at times, be augmented by other signals, such as Wi-Fi.

36.     The precision of the location signals gathered by Defendants is high. Defendant Gravy Analytics states that location signals "should be at least 5 decimal places of precision." The more decimal points in a location signal, the more precise the signal is. At 5 decimal points, the signal identifies consumers'—including Plaintiff's and Class Members'—locations to within approximately one meter of precision. This means the signal is sufficiently precise to identify not only what building a consumer is visiting, but even what room the consumer is in.

37.     Defendants also tout the accuracy of their data. For example, Defendants assert that they have "implemented algorithms that process billions of data points daily [and] filter out unreliable signals," thus leaving Defendants with only data signals that they have been "verified as accurate." Defendants also explain that, when associating a data signal with a location, they use hand-drawn polygons (that is, using employees to draw the shape of the location being tracked) that "traces the walls of the venue," so that their data is "based on real people visiting real locations" without any "modeling."

***Defendants' Business***

9

38.     Defendants' business model is to compile massive amounts of mobile geolocation data collected from consumers and then disclose this information to third parties for a price. Defendant Gravy Analytics focuses on selling this information to commercial customers, while its subsidiary, Defendant Venntel, sells the information to public sector customers.

39.     Defendants deliver data to their customers—which include major corporations like Apple, Uber, and Equifax—through file transfers at regular intervals, such as daily or weekly, or providing access through an Application Programming Interface. In addition to continuously updating their Application Programming Interface new data, Defendants offer their customers the opportunity to search and receive at least three years of historical data.

40.     Defendant Gravy Analytics sells multiple data products based on the consumer geolocation data it has compiled. For example, Gravy Analytics transfers raw precise mobile location data – that is timestamped latitude and longitude coordinates tied to, among other things, a unique mobile identifier and IP address – to customers via batch deliveries through the cloud. Gravy Analytics offers data from as recent as the prior 48 hours to the previous year.

41.     Defendant Gravy Analytics also sells a tool that allows a marketer to "geo-fence" a location and obtain a list of mobile phone identifiers that were present at that location during a specific timeframe. For example, using this tool, a Gravy Analytics' customer could generate a list of unique identifiers that attended a private event for a political cause, a sporting event, or a concert. Gravy Analytics itself has used geo-fencing to create a list of unique identifiers that visited specific churches and health-related events for customers. More broadly, Defendants have tracked consumers to various sensitive locations, including places of worship, political rallies, and locations associated with medical conditions or decisions.

10

42.    Defendant Gravy Analytics also transfers location data to its subsidiary, Defendant Venntel. Defendant Venntel, in turn, sells the information to public sector customers, such as government contractors.

43.    Defendant Venntel also provides enhanced tools to its public sector customers to analyze and access consumers' location data including the ability to "continuously" track a single device.

44.    The precise geolocation data, associated with these unique mobile identifiers or other identifiers, licensed, used, and sold by Defendants could be used to track consumers to sensitive locations, including places of religious worship, places that may be used to infer an LGBTQ+ identification, domestic abuse shelters, medical facilities, political activity, and welfare and homeless shelters.

### *The Location Data Collected by Defendants is Personally Identifiable Information*

45.    The data collected by Defendants enables those who obtain it to precisely track individuals. This is because Defendants' precise geolocation data is not anonymous. Defendants associate their precise geolocation data with unique persistent identifiers, including unique mobile identifiers which are considered by the FTC to be personally identifiable information ("PII") as, among other things, they allow companies to track and contact individual consumers.

46.    In addition, the FTC has found that identifying consumers by name or other identifying information from Defendants' geolocation data is straightforward, whether through tracking their movements or by using services that connect unique mobile identifiers to names and other PII.

47.    Outside of the context of the instant Data Breach, the ability to identify and target consumers based on precise geolocations has already occurred. For example, a Catholic priest was

outed and forced to resign his position based on location data that was collected from his mobile device and then sold to a group who used it to track priests' movements.[6]

### There is a Market for the Collection, Use, and Sale of the Location Data Defendants Collect

48.    The precise mobile location data collected, used, and sold by Defendants is sensitive and valuable information. Defendants use this data to target consumers based on the sensitive characteristics and behaviors that the location data reveals about consumers.

49.    In addition to selling location data to customers for this use, Gravy Analytics itself also analyzes the data to create additional data products to sell to its customers. For example, Gravy Analytics uses the data it collects to create "audience segments," or subsets of consumers who share interests or characteristics, including audience segments based on sensitive interests or characteristics. These groupings are formed based on the locations and events visited by mobile devices, combined with other information gathered about consumers, and allow Gravy Analytics' customers to identify and target consumers based on identified sensitive and personal interests or characteristics.

50.    Gravy Analytics offers over 1100 audience segments with each segment made up of unique segments that meet the targeted interest or characteristic. These segments are built about practically every aspect of a consumer's life, including their employment, personal habits, and retail activity. For example, Gravy Analytics has offered audience segments such as "Early Risers," "Sports Betting Enthusiast," "McDonald's Breakfast Diners," "Healthy Dads," "Restaurant Visitor during COVID Quarantine," and "Lingerie Retail Shoppers." Yet other segments are based on political activity. For example, Gravy Analytics has offered audience

---

[6] Associated Press, NBC News (July 22, 2021), https://www.nbcnews.com/tech/security/priest-outed-grindr-app-highlights-rampant-data-tracking-rcna1493.

segments such as "Political Activist," "Likely Republican Voter," and "Likely Democrat Voter." Gravy Analytics explains that the "Likely Republican Voter" segment is based on consumers "attending Republican focused political events and events and venues affiliated with conservative topics."[7]

51.    This location data is extremely valuable as demonstrated by the large and growing market for location data. In the United States alone, the location data market was valued at $5.42 billion in 2024 and is projected to grow to over $16 billion by 2034

### The FTC Complaint

52.    On December 3, 2024, The FTC took action against Defendants Gravy Analytics and Venntel for unlawfully tracking and selling sensitive location data from users, including selling data about consumers' visits to health-related locations and places of worship.[8]

53.    The FTC's complaint[9] alleged that Gravy Analytics and Venntel violated the FTC Act by unfairly selling sensitive consumer location data, and by collecting and using consumers' location data—including Plaintiff's and Class Members'—without obtaining verifiable user consent.

54.    The Director of the FTC's Bureau of Consumer Protection, Samuel Levine, explained that "Surreptitious surveillance by data brokers undermines our civil liberties and puts servicemembers, union workers, religious minorities, and others at risk. . . This is the FTC's fourth

---

[7] FTC Complaint, ¶ 50.

[8] *FTC Takes Action Against Gravy Analytics, Venntel for unlawfully tracking and selling sensitive location data from users, including selling data about consumers' visits to health-related locations and places of worship.*, FED. TRADE COMM. (Dec. 3, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/12/ftc-takes-action-against-gravy-analytics-venntel-unlawfully-selling-location-data-tracking-consumers

[9] *In the Matter of Gravy Analytics, Inc. and Venntel, Inc.*, No. 212-3035 (Dec. 3, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/2123035gravyanalyticscomplaint.pdf.

action taken this year challenging the sale of sensitive location data, and it's past time for the industry to get serious about protecting Americans' privacy."

55.    Indeed, the FTC found that Defendants cause or were likely to cause consumers to suffer from stigma, discrimination, physical violence, emotional distress, and other harms—and this was in the context of Plaintiff's and Class Members' data falling into the hands of verified purchasers. These risks are only magnified by the instant Data Breach as consumers' data has fallen into the hands of not just advertisers looking to capitalize on the Class, but rather into the hands of cybercriminals with malicious intent.

56.    Moreover, the FTC has explained that once information is collected about consumers—including Plaintiff and Class Members—from their mobile devices or other sources, the information can be and, in many instances, is provided multiple times to companies that consumers have never heard of and never interacted with. Consumers have no insight into how their data is used. Consumers are therefore unable to take reasonable steps to avoid the above-described injuries.

57.    The Commission voted 5-0 to issue the administrative complaint against Defendants Gravy Analytics and Venntel, and to accept the consent agreement with the companies.

58.    On January 14, 2025, the FTC finalized an order prohibiting Gravy Analytics and its subsidiary Venntel from unlawfully tracking and selling sensitive location data from users, including data about consumers' visits to health-related locations and places of worship. Under the final order, Gravy Analytics and Venntel will be prohibited from selling, disclosing, or using sensitive location data except in limited circumstances involving national security or law

enforcement. The order also required that the companies establish a sensitive data location program.[10]

### *Defendants Acquire, Collect, and Store Plaintiffs' and Class Members' Location Data*

59.     As described above, Defendants acquire, collect, and store a significant amount of location data belonging to Class Members.

60.     As a condition of utilizing various applications on their mobile devices Plaintiff and Class Members are required to entrust their highly sensitive location data to Defendants, whether they know they are consenting to do so or not.

61.     By obtaining, collecting, and using Plaintiff's and Class Members' location data, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiff's and Class Members' location data from disclosure.

62.     It was reasonable for Plaintiff and Class Members to believe that any location data entrusted to Defendants or other third-party data brokers was entrusted with the implicit promise that such guardians of that data would adequately safeguard that information.

63.     Upon information and belief, while collecting location data from Plaintiff and Class Members, Defendants promised, explicitly or implicitly, to provide confidentiality and adequate security for their data through their applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

64.     In fact, the Privacy Policy Defendants publicize on their website claims: "We have implemented appropriate administrative, technical, and physical safeguards to protect the

---

[10] Final Order *In the Matter of Gravy Analytics, Inc. and Venntel Inc.*, https://www.ftc.gov/system/files/ftc_gov/pdf/2123035gravyanalyticsorder.pdf.

1021114.1

information we collect from loss, misuse, and unauthorized access, disclosure, alteration, and destruction."[11]

65.    Plaintiff and the Class Members relied on Defendants to keep their location data confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. The Data Breach occurred because Defendants failed to do so.

66.    Despite Defendants' duty to protect sensitive consumer location data, and the representations they made that they would do so, Defendants' data security practices fell short, leading to the Data Breach and compromise of consumer location data.

### *The Data Breach*

67.    At all relevant times, Defendants knew they were collecting and storing consumers'—including Plaintiff's and Class Members'—sensitive location data, and that, as a result, their systems would be attractive targets for cybercriminals. Indeed, cybercriminals did target and hack Defendants' systems, stealing massive amounts of data.

68.    On January 7, 2025, 404Media, an online publication that covers technology and internet news, reported that hackers claimed to have stolen a "mountain of data" from Gravy Analytics and were threatening to publish it.[12]

69.    404Media reported that, in a message posted to two of Defendant Gravy Analytics' websites, the hackers wrote that the "Personal information of millions of users is affected."[13] The

---

[11] https://gravyanalytics.com/privacy-policy#security-of-your-information

[12] Joseph Cox, *Hackers Claim Massive Breach of Location Data Giant, Threaten to Leak Data*, 404MEDIA (Jan. 7, 2025), https://www.404media.co/hackers-claim-massive-breach-of-location-data-giant-threaten-to-leak-data/.

[13] *Id.*

1021114.1

hackers also wrote that Defendants would "have 24h to answer or we will start to publish data."[14] This second statement suggests that the hackers were demanding a ransom for the stolen data.

70.     The samples of data posted by the hackers—which include *30 million location data points so far*—include the apparent historical location of individuals' smartphones and contain the precise latitude and longitude coordinates of the phone as well as the time at which the phone was there.[15] Among this data set, privacy researchers have already identified individual mobile devices at the White House in Washington, D.C. and at military bases around the world. Furthermore, this sample data set confirmed that the data stolen in the Data Breach allows for easy deanonymization of ordinary individuals; in one example, the data tracked a person as they traveled from New York to their home in Tennessee.

71.     The Data Breach poses an enormous threat to individual consumers, and the theft of this data amounts to severe injury to affected consumers in and of itself.

72.     Indeed, data privacy advocates have long warned of the risks that data brokers pose to individuals' privacy and national security. Researchers with access to the sample of Gravy Analytics' location data posted by the hacker say that the information can be used to extensively track people's recent whereabouts.

73.     On January 11, 2025, Norwegian broadcaster NRK reported that Defendant Unacast, disclosed the breach with the country's data protection authorities as required under its law. In the report to Norweigan state authorities, Unacast confirmed that attackers gained access to Defendants' cloud services: "Initial investigations indicate that an unauthorized person obtained

---

[14] *Id.*

[15] *Id.*

certain files that may contain personal data. These are now being analyzed." [16] More specifically, Unacast said that it identified on January 4 that a hacker acquired files from its Amazon cloud environment through a "misappropriated key."

74.     Defendants also acknowledged that they were initially made aware of the breach through communication with the hacker, but gave no further details. Defendants said their operations were briefly taken offline following the breach. [17]

75.     As of the filing of this complaint, Defendants have not officially reported the Data Breach to authorities in the United States, and have not released information about the number of U.S. citizens affected by the Data Breach and the exact composition of the location data that was stolen.

### *Defendants Knew, or Should Have Known, of the Risk Because Companies Housing Large Amounts of Data Have Become Increasingly and Particularly Susceptible to Cyberattacks*

76.     At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the location data of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendants' data security systems were breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

77.     Indeed, 2023 represented an all-time high for data breaches, with 3,205 breaches affecting 353,027,892 total victims. The estimated number of organizations impacted by data breaches has increased by +2,600 percentage points since 2018, and the estimated number of

---

[16] (translated) Aslak Øgrim Borgersrud, et al., *Data breach detected when hacker contacted*, NRK (Jan 10. 2025), https://www.nrk.no/norge/oppdaget-datainnbrudd-da-hackeren-tok-kontakt-1.17201694.

[17] *Id.*

victims has increased by +1400 percentage points. The 2023 breaches represent a 78-percentage point increase over the previous year and a 72-percentage point hike from the previous all-time high number of breaches (1,860) set in 2021.

78.    In light of recent high profile data breaches across industries in the year immediately prior to the Data Breach, including T-Mobile, USA (37 million records, February-March 2023), and NCB Management Services, Inc. (1 million records, February 2023), and affecting healthcare entities and partners in recent years, including UnitedHealth (190 million), American Medical Collection Agency (25 million patients, March 2019), University of Washington Medicine (974,000 patients, December 2018), Florida Orthopedic Institute (640,000 patients, July 2020), Wolverine Solutions Group (600,000 patients, September 2018), Oregon Department of Human Services (645,000 patients, March 2019), Elite Emergency Physicians (550,000 patients, June 2020), Magellan Health (365,000 patients, April 2020), and BJC Health System (286,876 patients, March 2020), Defendants knew or should have known that the location data they collected and maintained would be targeted by cybercriminals.

79.    Moreover, the FTC has recently directed numerous actions against the location data industry specifically, filing four separate actions in 2024 alone, which challenge the sale of sensitive location data. These enforcement actions should have put Defendants on notice about the high sensitivity and high risks associated with the location data they collected and stored from Plaintiff and Class Members. The FTC action against Defendants was the FTC's *fifth action* challenging the unfair handling of consumers' sensitive location data by data aggregators. The FTC's other cases include a 2022 action against Kochava for selling data tracking people to reproductive health clinics and other sensitive locations, and the January 2024 actions against X-Mode for selling raw location data and InMarket for selling precise user location data. The FTC

has also taken action against Mobilewalla for selling data tracking users to military sites, health clinics, churches, and other sensitive locations.

80.    Cyber-attacks, such as the one experienced by Defendants, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, smaller entities that store sensitive personal information are "attractive to ransomware criminals…because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[18]

81.    Defendants knew and understood unprotected or exposed location data is valuable and highly sought after by nefarious third parties seeking to illegally monetize that data through unauthorized access.

82.    The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the location data of Plaintiff and Class Members.

83.    The ramifications of Defendants' failure to keep secure the location data of Plaintiffs and Class Members are long-lasting and severe. Once this data is stolen, fraudulent and targeted malicious uses of that information and damage to victims may continue for years.

84.    Defendants, who are described as hosting a "mountain of data" traceable to Plaintiffs and Class Members, knew, or should have known, the importance of safeguarding this

---

[18]    https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-aa0155a8bb51&utm_source=newsletter&utm_medium=email&utm_campaign=consumerprotection (last visited, Dec. 10, 2024)

location data, and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiff and Class Members as a result of a breach.

### *Data Breaches Are Preventable*

85.     Despite the growing body of publicly available information regarding the rise of ransomware attacks and other forms of cyberattacks that compromise sensitive information, Defendants' approach to maintaining the privacy of Plaintiff and Class Members' location data was inadequate, unreasonable, negligent, and reckless. Defendants failed to use reasonable security procedures and practices, such as encrypting the information or deleting it when it is no longer needed, appropriate to the nature of the sensitive information Defendants were maintaining for Plaintiffs and Class Members, causing the exposure of their location data.

86.     Defendants could have prevented this Data Breach. Defendants could have and should have implemented measures—as recommended by the United States Government—to prevent and detect cyberattacks and/or ransomware attacks, including, but not limited to, the following recommendations:

- **Implement an awareness and training program**. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- **Enable strong spam filters** to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- **Scan all incoming and outgoing emails** to detect threats and filter executable files from reaching end users.

- **Configure firewalls** to block access to known malicious IP addresses.

- **Patch operating systems, software, and firmware on devices**. Consider using a centralized patch management system.

21

- **Set anti-virus and anti-malware programs to conduct regular scans automatically**. Ensure these programs run automatic scans to detect and remove potential threats.

- **Manage the use of privileged accounts based on the principle of least privilege**. No users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- **Configure access controls**—including file, directory, and network share permissions—with restricting privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- **Disable macro scripts from office files transmitted via email**. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- **Implement Software Restriction Policies (SRP)** or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- **Disable Remote Desktop protocol (RDP)** if it is not being used.

- **Use application whitelisting**, which only allows systems to execute programs known and permitted by security policy.

- **Execute operating system environments or specific programs in a virtualized environment**. Run sensitive systems or programs in isolated virtual environments to reduce risk.

- **Categorize data based on organizational value** and implement physical and logical separation of networks and data for different organizational units.[19]

87. To prevent and detect cyberattacks and ransomware attacks, Defendants could and should have implemented the following preventive measures, as recommended by Microsoft's Threat Protection Intelligence Team:

- **Secure internet-facing assets**

---

[19] *Id.*

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audits
- Remove privileged credentials

- **Thoroughly investigate and remediate alerts**

  - Prioritize and treat commodity malware infections as potential full compromise

- **Include IT Pros in security discussions**

  - Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely

- **Build credential hygiene**

  - Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

- **Apply principle of least-privilege**

  - Monitor for adversarial activities
  - Hunt for brute force attempts
  - Monitor for cleanup of Event Logs
  - Analyze logon events

- **Harden infrastructure**

  - Use Windows Defender Firewall
  - Enable tamper protection
  - Enable cloud-delivered protection
  - Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[20]

---

[20] *See Human-operated ransomware attacks: A preventable disaster*, Microsoft (Mar. 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.

1021114.1

88.     Similarly, Defendants could and should have implemented measures—recommended by the United States Government—to prevent and detect cyberattacks and/or ransomware attacks, including the following recommendations:

- Know what personal information you have in your files and on your computers.
- Keep only what you need for your business.
- Protect the information that you keep.
- Properly dispose of information you no longer need. Create a plan to respond to security incidents.[21]

89.     Finally, Defendants could and should have implemented the following measures—also recommended by the United States Government—to prevent and detect cyberattacks and/or ransomware attacks, including the following recommendations:

- **Conduct regular vulnerability scanning to identify and address vulnerabilities**, especially those on internet-facing devices, to limit the attack surface.

- **Regularly patch and update software and operating systems to the latest available versions**. Prioritize timely patching internet-facing servers-that operate software for processing internet data such as web browsers, browser plugins, and document readers-especially for known exploited vulnerabilities….

- **Limit the use of RDP and other remote desktop services**. If RDP is necessary, apply best practices. Threat actors often gain initial access to a network through exposed and poorly secured remote services, and later traverse the network using the native Windows RDP client.

- **Ensure all on-premises, cloud services, mobile, and personal devices are properly configured, and security features are enabled**. For example, disable ports and protocols that are not being used for business purposes.[22]

---

[21] Protecting Personal Information: A Guide for Business, https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited, Jan. 14, 2025)

[22] #StopRansomware Guide, https://www.cisa.gov/resources-tools/resources/stopransomware-guide (last visited, Dec. 5, 2024).

1021114.1

90.    Given that Defendants were collecting and storing highly sensitive location data belonging Plaintiff and Class Members, Defendants could and should have implemented all of the above measures to prevent and detect cyberattacks.

91.    The occurrence of the Data Breach indicates that Defendants failed to adequately implement one or more of the above measures to prevent cyberattacks or ransomware attacks, resulting in the Data Breach and data thieves accessing and acquiring the location data of Plaintiff and Class Members.

### *Defendants Failed to Comply with FTC Guidelines*

92.    The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

93.    For example, in 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established guidelines for fundamental data security principles and practices for businesses.  The guidelines explain that businesses should:

    a.   protect the personal customer information that they keep;

    b.   properly dispose of personal information that is no longer needed;

    c.   encrypt information stored on computer networks;

    d.   understand their network's vulnerabilities; and

    e.   implement policies to correct security problems.

94.    The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

95.    The guidelines further advise businesses: not to maintain certain sensitive data longer than necessary for authorization of a transaction; to limit access to sensitive data; to use an

1021114.1

intrusion detection system to expose a breach as soon as it occurs; to monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and to verify that third-party service providers have implemented reasonable security measures.[23]

96.     To underscore the binding significance and legal ramifications of the promulgated guidance, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

97.     These FTC enforcement actions include the December 2024 action against Defendant Gravy Analytics and Venntel, themselves, as discussed above.

98.     Because these and similar actions were initiated prior to the Data Breach, Defendants knew or should have known that their data security protocols were inadequate and were likely to result in the unauthorized access to and/or theft of the sensitive location data they possessed.

99.     Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendants' duties in this regard.

---

[23] *Id.*

1021114.1

100.    Defendants failed to properly implement basic data security practices.

101.    Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' location data, or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

102.    Upon information and belief, Defendants were at all times fully aware of their obligations to protect the sensitive data of Plaintiff and Class Members, Defendants were also aware of the significant repercussions that would result from their failure to do so. Accordingly, Defendants' conduct was particularly unreasonable given the nature and amount of location data they obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

### *Defendants Failed to Comply with Industry Standards*

103.    Experts studying cybersecurity routinely identify entities housing massive troves of data as being particularly vulnerable to cyberattacks because of the value of the data which they collect and maintain.

104.    In light of the evident threat of cyberattacks seeking data held by companies, like Defendants that can be considered data brokers, several best practices have been identified that at a minimum should be implemented, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data; monitoring and limiting network ports; and protecting web browsers and email management systems. Defendants failed to follow these industry best practices.

105.    Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

106.    These foregoing frameworks are existing and applicable industry standards for major data brokers, and Defendants failed to comply with these accepted standards, thereby opening the door to the cybercriminals and causing the Data Breach.

### Defendants Had State and Common Law Duties to Protect and Safeguard Plaintiff's and Class Members' Location Data

107.    Pursuant to various state laws and common law, Defendants were required to protect Plaintiff's and Class Members' location data entrusted to its care.

108.    These duties required Defendants to exercise reasonable care in collecting, using and maintaining Plaintiff's and Class Members' location data from compromise, loss, theft, unauthorized access, or misuse.

119.    These duties required Defendants to implement reasonable security measures and practices to protect Plaintiff's and Class Members' location data from unauthorized exposure, including designing, maintaining, regularly testing its computer and email systems, and properly training its employees and others with access to location data within its computer systems on how to securely handle and protect such data.

120.    Defendants owed a duty to Plaintiff and the Class Members, whose location data was entrusted to their care, to disclose if their computer systems and data security practices were inadequate to protect their location data from unauthorized access. Such an inadequacy would

28

constitute a material fact in Plaintiff's and Class Members' decision to entrust their location data to Defendants, even indirectly.

121.    Defendants owed a duty to Plaintiff and the Class Members, whose location data was entrusted to their care, to promptly and accurately disclose any data breaches that occurred.

122.    Defendants breached each of these respective duties to prevent the Data Breach and, with respect to notice, following the Data Breach.

### Common Injuries & Damages: The Data Breach will Foreseeably Harm American Consumers

125.    The moment that Plaintiff's and Class Members' location data was accessed and obtained by a third party without their consent or authorization, Plaintiff and Class Members suffered injury from a loss of privacy.

126.    Additionally, Plaintiff and Class Members have been further injured by the damages to and loss in value of their location data—a form of intangible property with inherent value that Plaintiff and Class Members were deprived of as a result of the Data Breach, when that location data was made accessible to and obtained by cybercriminals.

127.    Given the sensitive and personal nature of the location data involved and the intentional, targeted means through which the information was obtained by cybercriminals, the Data Breach has also caused Plaintiff and Class Members to suffer imminent harm arising from a substantially increased risk of fraud, financial crimes, and crimes of intimidation which may arise from their highly granular location data being in the hands of criminals, as a direct and proximate result of Defendants' misconduct.

128.    Identification of private and sensitive characteristics of consumers from the location data Defendants failed to adequately safeguard is also likely to injure consumers through exposure to blackmail, stigma, discrimination, physical violence, and other harms.

129.    The substantial risk of imminent harm and loss of privacy have also caused Plaintiff and Class Members to suffer stress, fear, emotional distress, and anxiety.

130.    As described above, the location data involved in the Data Breach can be used to link individuals to highly private locations, including places of worship, government buildings, abortion clinics, or other sensitive healthcare locations. The fact that malicious actors with the intent to publicize and/or profit from this information have obtained this data presents an intrusion into the most private areas of Plaintiff's and Class Members' lives, and this intrusion alone represents a substantial injury to Plaintiff and Class Members.

131.    For example, Defendants are known to have used geo-fencing to trace and group consumers—including Plaintiff and Class Members—based on visits to specific churches, health and medical-related events, and political activity. Such location data, if obtained by malicious actors and traced to and leveraged against an individual consumer could easily be used to threaten fundamental protections to bodily autonomy and religious or political freedom.[24] Indeed Defendants, are known to have segmented a consumer base of "abortion-minded women," which Defendants identified as consumers who, according to their precise geolocation, were "close to or entered the waiting rooms of women's reproductive health clinics."[25]

132.    Additionally, the location data exposed by the Data Breach is extremely valuable as demonstrated by the large and growing market for location data. In the United States alone, the location data market was valued at $5.42 billion in 2024 and is projected to grow to over $16 billion by 2034.[26]

---

[24] FTC Complaint, *In the Matter of Gravy Analytics, Inc. and Venntel, Inc.*, No. 212-3035, https://www.ftc.gov/system/files/ftc_gov/pdf/2123035gravyanalyticscomplaint.pdf

[25] *Id.*

[26] https://www.precedenceresearch.com/location-intelligence-

133.    Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants' network and thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

134.    As a result of Defendants' ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of the Class's location data ending up in the possession of criminals, Plaintiff and Class Members have all sustained actual injuries and damages, including: (i) invasion of privacy; (ii) theft of their location data; (iii) lost or diminished value of location data; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) nominal damages; and (vii) the continued and certainly increased risk to their location data, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the location data..

135.    The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement and maintain adequate data security measures to protect Plaintiff's and Class Members' location data.

***Plaintiff Unique Little's Experience***

136.    Plaintiff Little currently uses (or has used in the recent past) several mobile applications that provide location data to Defendants, including Microsoft Outlook, MyFitnessPal, Candy Crush, and Tinder.

---

market#:~:text=The%20U.S.%20location%20intelligence%20market,11.83%25%20from%202020
24%20and%202034.

1021114.1

137.    As a condition of using these applications, Plaintiff Little was required to entrust her location data to Defendants.

138.    Upon information and belief, at the time of the Data Breach, Defendants stored and maintained Plaintiff Little's location data in its systems.

139.    Plaintiff Little would not have entrusted her location data to Defendants had she known of Defendants' lax data security policies.

140.    Upon information and belief, Plaintiff Little's location data was targeted, accessed, and acquired in the Data Breach.

141.    As a result of the Data Breach, Plaintiff Little made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach. Plaintiff Little has spent significant time dealing with the Data Breach—valuable time Plaintiff Little otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

142.    Plaintiff Little suffered actual injury as a result of the unauthorized access and disclosure of her location data in the Data Breach including, but not limited to: (i) invasion of privacy; (ii) disclosure and/or theft of her location data; (iii) lost or diminished value of her location data; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) nominal damages; and (vi) the continued and certainly increased risk to her location data, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect her location data.

1021114.1

143.    The Data Breach has caused Plaintiff Little to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not informed Plaintiff Little of key details about the Data Breach's occurrence.

144.    As a result of the Data Breach, Plaintiff Little anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

145.    Plaintiff Little has a continuing interest in ensuring that her location data, which, upon information and belief, remains in Defendants' continued possession, is protected and safeguarded from future breaches.

## CLASS ALLEGATIONS

146.    Plaintiff brings this class action on behalf of herself and on behalf of all others similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), 23(b)(3), 23(c)(4) and/or 23(c)(5), the "Class".

147.    The Nationwide Class and California Subclass that Plaintiff seeks to represent are defined as follows:

> **Nationwide Class**: All individuals residing in the United States whose location data was accessed and/or acquired by an unauthorized party as a result of the Data Breach.

> **California Subclass**: All individuals residing in California whose location data was accessed and/or acquired by an unauthorized party as a result of the Data Breach.

148.    Excluded from these class definitions are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be

excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

149. Plaintiff reserves the right to amend these class definitions or add a Class or Subclass if further information and discovery indicate that the definitions should be narrowed, expanded, or otherwise modified.

150. **Numerosity**: The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. Although the precise number of individuals is currently unknown to Plaintiff and exclusively in the possession of Defendants, upon information and belief, millions of individuals were impacted. The Class is apparently identifiable within Defendants' records.

151. **Commonality and Predominance**: Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class that predominate over questions which may affect individual Class members, including the following:

a. Whether and to what extent Defendants had a duty to protect the location data of Plaintiff and Class Members;

b. Whether Defendants had a duty not to disclose the location data of Plaintiff and Class Members to unauthorized third parties;

c. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

d. Whether Defendants failed to adequately safeguard the location data of Plaintiff and Class Members;

34

e.   Whether and when Defendants actually learned of the Data Breach;

f.   Whether Defendants adequately, promptly, and accurately informed Plaintiffs and Class Members that their location data had been compromised;

g.   Whether Defendants violated the law by failing to promptly notify Plaintiffs and Class Members that their location data had been compromised;

h.   Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

i.   Whether Defendants data security protocols prior to and during the Data Breach complied with applicable data security laws and regulations;

j.   Whether Defendants' data security protocols prior to and during the Data Breach were consistent with industry standards;

k.   Whether Defendants owed a duty to Plaintiff and Class Members to safeguard their location data;

l.   Whether Defendants breached their duties to Plaintiff and Class Members to safeguard their location data;

m.   Whether cyberhackers obtained, sold, copied, stored, or released Plaintiffs' Class Members' location data;

n.   Whether Defendants knew or should have known that their data security practices, policies, procedures, and monitoring processes were deficient;

o.   Whether Plaintiff and Class Members are entitled to actual damages and/or nominal damages as a result of Defendants' wrongful conduct;

p.   Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

152.    **Typicality**: Plaintiff's claims are typical of those of the other members of the Class because Plaintiff, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

153.    **Policies Generally Applicable to the Class**: This class action is also appropriate for certification because Defendants acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenges of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

154.    **Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages she has suffered are typical of other Class Members. Plaintiff has retained counsel experienced in complex class action and data breach litigation, and Plaintiffs intend to prosecute this action vigorously.

155.    **Superiority and Manageability**: The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually

1021114.1

afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

156.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

157.    The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

158.    Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

159.    Unless a Class-wide injunction is issued, Defendants may continue in their failure to properly secure the location information of Class Members, Defendants may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendants may continue to act unlawfully as set forth in this Complaint.

160.    Further, Defendants have acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a classwide basis.

161.    Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.    Whether Defendants failed to timely notify Plaintiff and the Class of the Data Breach;

    b.    Whether Defendants owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their location information;

    c.    Whether Defendants' security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

    d.    Whether Defendants' failure to institute adequate protective security measures amounted to negligence;

    e.    Whether Defendants failed to take commercially reasonable steps to safeguard consumer location data; and

    f.    Whether adherence FTC data security recommendations and measures recommended by data security experts would have reasonably prevented the Data Breach.

## CAUSES OF ACTION

### COUNT I
### Negligence and Negligence *per se*
### (On Behalf of Plaintiff and the Class)

162.    Plaintiff repeats and realleges and incorporate by reference all the preceding factual allegations, as if fully set forth herein.

163.    Defendants collected, stored, and maintained the location data of Plaintiff and the Class as part of the regular course of their business operations, which services affects commerce.

164.    Defendants had full knowledge of the sensitivity of the location data and the types of harm that Plaintiff and Class Members could and would suffer if the location data were wrongfully disclosed.

165.    By voluntarily undertaking and assuming the responsibility to collect and store this data, in fact doing so, and sharing it and using it for commercial gain, Defendants had a duty of care to use reasonable means to secure and safeguard their computer systems—and Class Members' location data held within—to prevent disclosure of the information, and to safeguard the information from theft. Defendants' duties included a responsibility to implement processes by which they could detect a breach of their security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach; maintaining security measures consistent with industry standards; and exercising appropriate discretion in selecting third-party vendors with which Plaintiff's and Class Members' location data is shared.

166.    More broadly, Defendants owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the location data in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

167.    Defendants also had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in

or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

168.    Defendants also owed a duty to ensure the location data of Plaintiff and Class Members that was in its possession, was in its possession with the verified consent of Plaintiff and Class Members. However, on information and belief, Defendants collected Plaintiff's and Class Members' location data without taking reasonable steps to verify that consumers provide informed consent to Defendants' collection, use, or sale of the data for commercial and government purposes.

169.    Defendants owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks adequately protected the location data in its custody.

170.    Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above but also because Defendants are bound by industry standards to protect Plaintiff's and Class Members' data.

171.    Defendants were subject to an "independent duty," untethered to any contract between Defendants and Plaintiff or the Class.

172.    Moreover, Defendants had a duty to promptly and adequately notify Plaintiff and the Class of the Data Breach.

173.    Defendants had and continue to have a duty to adequately disclose that the location data of Plaintiff and the Class within Defendants' possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity theft and/or fraudulent misuse of their location data by third parties.

174.    Defendants breached their duties, pursuant to the FTC Act and other applicable standards, and thus were negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' location data. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

    a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' location data;

    b.  Failing to adequately monitor the security of its networks and systems;

    c.  Allowing unauthorized access to Class Members' location data;

    d.  Failing to detect in a timely manner that Class Members' location data had been compromised; and

    f.  Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

175.    Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect location data and not complying with applicable industry standards, as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of location data they obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

176.    Plaintiff and Class Members are within the class of persons the FTC Act was intended to protect and the type of harm that resulted from the Data Breach is the type of harm that the statute was intended to guard against.

177.    Defendants' violation of Section 5 of the FTC Act constitutes negligence.

178.    Defendants' failure to comply with relevant laws and regulations also constitutes negligence *per se*.

179.    The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

180.    A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendants' inadequate security practices.

181.    It was foreseeable that Defendants' failure to use reasonable measures to protect Class Members' location data would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks across many different industries.

182.    Defendants had full knowledge of the sensitivity of the location data they collected and stored, and the types of harm that Plaintiff and the Class could and would suffer if their location data was wrongfully accessed and/or disclosed.

183.    Plaintiff and the Class were the foreseeable and probable victims of any inadequate data security practices and procedures. Defendants knew or should have known the inherent risks in collecting and storing the location data of Plaintiff and the Class, the critical importance of providing adequate security to protect that location data, and the necessity of encrypting the sensitive location data stored on Defendants' systems.

184.    It was therefore foreseeable that the failure to adequately safeguard Class Members' location data would result in one or more types of injuries to Class Members.

185.    Plaintiff and the Class had no ability to protect their location data after they entrusted it to Defendants.

186.    Defendants were in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

187.    Neither Plaintiff nor Class Members contributed to the Data Breach or subsequent misuse of their location data as described in this Complaint.

188.    Defendants' duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

189.    But for Defendants' wrongful and negligent breach of duties owed to Plaintiff and the Class, the location data of Plaintiff and the Class would not have been compromised.

190.    There is a close causal connection between Defendants' failure to implement and maintain adequate data security measures to protect the location data of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The location data of Plaintiff and the Class was lost and accessed as a proximate result of Defendants' failure to exercise reasonable care in safeguarding their location data by adopting, implementing, and maintaining appropriate data security measures.

191.    As a direct and proximate result of Defendants' negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their location data; (iii) lost or diminished value of their location data; (iv) lost time and

opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) nominal damages; and (vi) the continued and certainly increased risk to their location data, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains in Defendants' continued possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect their location data.

192.    Additionally, as a direct and proximate result of Defendants' negligence, Plaintiff and the Class have suffered and will suffer the continued risk of exposure of their location data, which remains in Defendants' continued possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect their location data.

193.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

194.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to: (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring and identity theft protection services to all Class Members.

### <u>COUNT II</u>
### **Breach of Implied Contract**
### <u>**(On Behalf of Plaintiff and the Class)**</u>

195.    Plaintiff repeats and realleges and incorporates by reference all the preceding factual allegations, as if fully set forth herein.

196.    Defendants collected, stored, and maintained the location data of Plaintiff and the Class.

197.    Plaintiff and Class Members provided their location data to Defendants, indirectly, in the ordinary course of business as a requirement to access and use their preferred mobile applications on their mobile devices. These mobile applications had monetary value to Plaintiff and Class Members, the value of which was significantly decreased as a result of Defendants' substandard data security practices.

198.    Defendants offered, and invited Class Members to provide their location data as part of Defendants' regular business practices. Per the requirements to use their preferred mobile applications, Plaintiff and Class Members accepted Defendants' offers and provided their location data to Defendant.

199.    Plaintiff and Class Members entrusted Defendants, directly or indirectly, with their location data with the reasonable and mutual understanding that Defendants would safeguard their information.

200.    Defendants accepted possession of Plaintiff's and Class Members' location data for the purpose of compiling, storing, selling, and profiting from the location data of Plaintiff and Class Members.

201.    When Plaintiff and Class Members provided their location data to Defendants in the course of using certain applications on their mobile devices, they entered into implied contracts with Defendants.

202.    Plaintiff and Class Members, therefore, entered into implied contracts with Defendants by which Defendants agreed to safeguard and protect their location data, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen.

203.    In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendants' data security practices complied with relevant laws and regulations (including FTC guidelines on data security) and were consistent with industry standards.

204.    Implicit in the agreements between Plaintiff and Class Members and Defendants, was Defendants' obligation to: (a) use such location data for valid business purposes only; (b) take reasonable steps to safeguard that location data; (c) prevent unauthorized access to and/or disclosures of the location data; (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their location data; (e) reasonably safeguard and protect the location data of Plaintiff and Class Members from unauthorized disclosure or uses; and (f) retain the location data only under conditions that kept such information secure and confidential.

205.    The mutual understanding and intent of Plaintiff and Class Members on the one hand, and Defendants, on the other, is demonstrated by their conduct and course of dealing.

206.    On information and belief, at all relevant times Defendants promulgated, adopted, and implemented written privacy policies whereby they expressly promised that they would only disclose location data under certain circumstances, none of which relate to the Data Breach.

207.    On information and belief, Defendants further promised to comply with industry standards and to make sure that Plaintiff's and Class Members' location data would remain protected.

208.    Plaintiff and Class Members provided their location data to Defendants with the reasonable belief and expectation that Defendants would use part of those payments to obtain adequate data security. Defendants failed to do so.

209. Plaintiff and Class Members would not have entrusted their location data to Defendants in the absence of an implicit assurance that Defendants would keep their location data secure from unauthorized access and/or disclosure.

210. Plaintiff and Class Members would not have entrusted their location data to Defendants in the absence of an implied promise to monitor their computer systems and networks to ensure it adopted reasonable data security measures.

211. Every contract in this State has an implied covenant of good faith and fair dealing, which is an independent duty and may be breached even when there is no breach of a contract's actual and/or express terms.

212. Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

213. Defendants breached the implied contracts made with Plaintiff and the Class by failing to safeguard and protect their location data and by failing to provide adequate notice to them that their location data was compromised as a result of the Data Breach.

214. Defendants breached the implied covenant of good faith and fair dealing by failing to maintain adequate computer systems and data security practices to safeguard location data failing to timely and accurately disclose the Data Breach to Plaintiff and Class Members, and continued acceptance and storage location data after Defendants knew, or should have known, of the security vulnerabilities of the systems that were exploited in the Data Breach.

215. As a direct and proximate result of Defendants' breach of the implied contracts, Plaintiff and Class Members sustained damages, including, but not limited to: (i) invasion of privacy; (ii) theft of their location data; (iii) lost or diminished value of their location data; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the

Data Breach) (v) statutory damages; (vii) nominal damages; and (viii) the continued and certainly increased risk to their location data, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains in Defendants' continued possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect their location data.

216.    Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

217.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to: (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring and identity theft protection services to all Class Members.

### COUNT III
### Unjust Enrichment
### (On Behalf of Plaintiff and the Class)

218.    Plaintiff restates and realleges the preceding factual allegations set forth above as if fully alleged herein.

219.    Plaintiff brings this claim on behalf of herself and on behalf of the Class.

220.    Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' location data, which cost savings increased the profitability of its services.

221.    Upon information and belief, instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants instead calculated to avoid their data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective

security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' failure to provide the requisite security.

222.    Under the principles of equity and good conscience, Defendants should not be permitted to retain the monetary value of the benefit belonging to Plaintiff and Class Members, because Defendants failed to implement appropriate data management and security measures that are mandated by industry standards.

223.    Defendants acquired the monetary benefit, location data, through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

224.    Had Plaintiff and Class Members known that Defendants had not secured their location data, they would not have agreed to provide location data to Defendants. Plaintiff and Class Members have no adequate remedy at law.

225.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to:

a. Theft of their location data;

b. Costs associated with purchasing credit monitoring and identity theft protection services;

c. Costs associated with the detection and prevention of identity theft and unauthorized use of their location data;

d. Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach;

e. The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their location data being placed in the hands of criminals;

f. Damages to and diminution in value of their location data entrusted, directly or indirectly, to Defendants with the mutual understanding that Defendants would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

g. Continued risk of exposure to hackers and thieves of their location data, which remains in Defendants' possession and is subject to further breaches so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data; and

h. Emotional distress from the unauthorized disclosure of location data to strangers likely to have criminal intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

226.    Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

227.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, e.g., (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

1021114.1

228.    Moreover, Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them.

**COUNT IV**
**Violation of California's Unfair Competition Law ("UCL")**
**Cal Bus. & Prof. Code § 17200, *et seq*.**
**(On Behalf of the Plaintiff and the California Subclass)**

229.    Plaintiff restates and realleges the preceding factual allegations set forth above as if fully alleged herein.

230.    Defendants engaged in unlawful and unfair business practices in violation of Cal. Bus. & Prof. Code § 17200, et seq. which prohibits unlawful, unfair, or fraudulent business acts or practices ("UCL").

231.    Defendants' conduct is unlawful because it violates the California Consumer Privacy Act of 2018, Civ. Code § 1798.100, et seq. (the "CCPA"), and other state data security laws.

232.    Defendants stored the sensitive location data of Plaintiff and the Class in their computer systems and knew or should have known they did not employ reasonable, industry standard, and appropriate security measures that complied with applicable regulations and that would have kept Plaintiff's and the Class's location data secure so as to prevent the loss or misuse of that location data.

233.    Defendants failed to disclose to Plaintiff and the Class that their location data was not secure. However, Plaintiff and the Class were entitled to assume, and did assume, that Defendants had secured their location data. At no time were Plaintiff and the Class on notice that their location data was not secure, which Defendants had a duty to disclose.

234.    Defendants also violated California Civil Code § 1798.150 by failing to implement and maintain reasonable security procedures and practices, resulting in an unauthorized access and exfiltration, theft, or disclosure of Plaintiff's and the Class's nonencrypted and nonredacted location data.

235.    Had Defendants complied with these requirements, Plaintiff and the Class would not have suffered the damages related to the data breach.

236.    Defendants' conduct was unlawful, in that it violated the CCPA.

237.    Defendants' acts, omissions, and misrepresentations as alleged herein were unlawful and in violation of, inter alia, Section 5(a) of the Federal Trade Commission Act.

238.    Defendants' conduct was also unfair, in that it violated a clear legislative policy in favor of protecting consumers from data breaches.

239.    Defendants' conduct is an unfair business practice under the UCL because it was immoral, unethical, oppressive, and unscrupulous and caused substantial harm. This conduct includes employing unreasonable and inadequate data security despite its business model of actively collecting location data.

240.    Defendants also engaged in unfair business practices under the "tethering test." Their actions and omissions, as described above, violated fundamental public policies expressed by the California Legislature. *See, e.g.*, Cal. Civ. Code § 1798.1 ("The Legislature declares that . . . all individuals have a right of privacy in information pertaining to them . . . The increasing use of computers . . . has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information."); Cal. Civ. Code § 1798.81.5(a) ("It is the intent of the Legislature to ensure that personal information about California residents is protected."); Cal. Bus. & Prof. Code § 22578 ("It is the intent of the Legislature that this chapter [including the Online

Privacy Protection Act] is a matter of statewide concern."). Defendants' acts and omissions thus amount to a violation of the law.

241.    Instead, Defendants made the location data of Plaintiff and the Class accessible to scammers, identity thieves, and other malicious actors, subjecting Plaintiffs and the Class to an impending risk of identity theft. Additionally, Defendants' conduct was unfair under the UCL because it violated the policies underlying the laws set out in the prior paragraph.

242.    As a result of those unlawful and unfair business practices, Plaintiff and the Class suffered an injury-in-fact and have lost money or property.

243.    The injuries to Plaintiff and the Class greatly outweigh any alleged countervailing benefit to consumers or competition under all of the circumstances.

244.    There were reasonably available alternatives to further Defendants' legitimate business interests, other than the misconduct alleged in this complaint.

245.    Therefore, Plaintiff and the Class are entitled to equitable relief, including restitution of all monies paid to or received by Defendants; disgorgement of all profits accruing to Defendants because of its unfair and improper business practices; a permanent injunction enjoining Defendants' unlawful and unfair business activities; and any other equitable relief the Court deems proper.

**COUNT V**
**Violation of the California Consumer Privacy Act**
**Cal. Civ. Code § 1798.150**
**(On Behalf of the Plaintiff and the California Subclass)**

246.    Plaintiff restates and realleges the preceding factual allegations set forth above as if fully alleged herein.

247.    Defendants violated California Civil Code § 1798.150 of the CCPA by failing to implement and maintain reasonable security procedures and practices appropriate to the nature of

the information to protect the nonencrypted location data of Plaintiffs and the Class. As a direct and proximate result, Plaintiff's and the Class's nonencrypted and nonredacted location data was subject to unauthorized access and exfiltration, theft, or disclosure.

248.    Defendants are each a business organized for the profit and financial benefit of its owners according to California Civil Code § 1798.140, that collects the personal information of its customers and employees, and whose annual gross revenues exceed the threshold established by California Civil Code § 1798.140(d).

249.    Plaintiff and Class Members seek injunctive or other equitable relief to ensure Defendants hereinafter adequately safeguards location data by implementing reasonable security procedures and practices. Such relief is particularly important because Defendants continue to hold location data, including Plaintiff's and Class Members' sensitive location data. Plaintiff and Class members have an interest in ensuring that their location data is reasonably protected, and Defendants have demonstrated a pattern of failing to adequately safeguard this information.

250.    Pursuant to California Civil Code § 1798.150(b), Plaintiff mailed a CCPA notice letter to Defendants' registered service agents, detailing the specific provisions of the CCPA that Defendants have violated and continues to violate. If Defendants cannot cure within 30 days—and Plaintiff believe such cure is not possible under these facts and circumstances—then Plaintiff intends to promptly amend this Complaint to seek statutory damages as permitted by the CCPA.

251.    As described herein, an actual controversy has arisen and now exists as to whether Defendants implemented and maintained reasonable security procedures and practices appropriate to the nature of the information so as to protect the personal information under the CCPA.

252.    A judicial determination of this issue is necessary and appropriate at this time under the circumstances to prevent further data breaches by Defendants.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and Class Members, requests judgment against Defendants and that the Court grant the following:

A.    For an Order certifying the Class, and appointing Plaintiff and her Counsel to represent the Class;

B.    For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the location data of Plaintiff and Class Members;

C.    For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

    i.    prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

    ii.    requiring Defendants to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

    iii.    requiring Defendants to delete, destroy, and purge the location data of Plaintiff and Class Members unless Defendants can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

    iv.    requiring Defendants to provide out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or

unauthorized use of their location data, for Plaintiff's and Class Members' respective lifetimes;

v.   requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the location data of Plaintiff and Class Members;

vi.   requiring Defendants to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

vii.   requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.   requiring Defendants to audit, test, and train its security personnel regarding any new or modified procedures;

ix.   requiring Defendants to segment data by, among other things, creating firewalls and controls so that if one area of Defendants' network is compromised, hackers cannot gain access to portions of Defendants' systems;

x.   requiring Defendants to conduct regular database scanning and securing checks;

xi.   requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees'

respective responsibilities with handling location data, as well as protecting the location data of Plaintiff and Class Members;

xii.　requiring Defendants to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii.　requiring Defendants to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting location data;

xiv.　requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendants' information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv.　requiring Defendants to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential location data to unauthorized third parties, as well as the steps affected individuals must take to protect themselves;

xvi.　requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants' servers; and

xvii.   for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the Class, and to report any deficiencies with compliance of the Court's final judgment;

D.   For an award of damages, including actual, statutory, nominal, consequential, and punitive damages, as allowed by law in an amount to be determined;

E.   For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.   For prejudgment interest on all amounts awarded; and

G.   Such other and further relief as this Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: January 31, 2025                     Respectfully submitted,

                                            */s/ Kristi C. Kelly*
                                            Kristi C. Kelly, VSB #72791
                                            Casey S. Nash, VSB #84261
                                            KELLY GUZZO, PLC
                                            3925 Chain Bridge Road, Suite 202
                                            Fairfax, VA 22030
                                            Telephone: (703) 424-7572
                                            Facsimile: (703) 591-0167
                                            Email: kkelly@kellyguzzo.com
                                            Email: casey@kellyguzzo.com

                                            James J. Pizzirusso
                                            HAUSFELD LLP
                                            888 16th Street N.W., Suite 300
                                            Washington, D.C. 20006
                                            T: 202.540.7200
                                            jpizzirusso@hausfeld.com

                                            Steven M. Nathan

HAUSFELD LLP
33 Whitehall Street 14th Floor
New York, New York 10004
T: 646.357.1100
snathan@hausfeld.com

Joseph J. DePalma
Catherine B. Derenze
LITE DEPALMA GREENBERG
&AFANADOR, LLC
570 Broad St., Suite 1201
Newark, NJ 07102
Tel: (973) 623-3000
jdepalma@litedepalma.com
cderenze@litedepalma.com

*Counsel for Plaintiff*

1021114.1